UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:11-CV-00553-TBR

KEITH CHARLES,                                                          Plaintiff,

v.

PRINT FULFILLMENT SERVICES, LLC,                                       Defendant.

## MEMORANDUM OPINION

Dissatisfied with his termination, Keith Charles filed this lawsuit against his former employer, Print Fulfillment Services, LLC, alleging wrongful discharge and age discrimination. (R. 9 ¶¶ 12–23 (Amended Complaint).)  PFS has moved for summary judgment on both counts. (R. 74 at 1 (Summary Judgment Motion).)  With respect to his wrongful discharge claim, Charles neither refused to follow any employment-related directive, nor did he ever exercise any well-established statutory right.  In the absence of those predicates, PFS says, his wrongful discharge claim fails as a matter of law.  And his age discrimination claim fairs no better.  According to PFS, Charles' overall job performance left something to be desired and gave it a legitimate reason to dismiss Charles from its employ.  Affording Charles the benefit of the doubt—to which he is entitled—the Court sees no genuine dispute of material fact and, therefore, **GRANTS** the Defendant's Motion for Summary Judgment (ECF No. 74).[1]

## I.

### A.

Print Fulfillment Services, LLC is a trade printing company located in Louisville, Kentucky.  (R. 54-1 at 4–5 (Barnum Deposition).)  It is a wholly-owned subsidiary of Farheap

---

[1] Because the Court has concluded that Charles has no wrongful termination or age discrimination claim, it will not address PFS's after-acquired evidence defense. *Cunningham v. Target Corp.*, No. 3:06-CV-00160-R, 2009 WL 1883923, at *9 n.3 (W.D. Ky. June 30, 2009).

Solutions, Inc., a Nevada corporation with its principal place of business in California.  (*Id.*)  On September 22, 2008, **Keith Charles** submitted an employment application to PFS.[2]  (R. 70-1 at 22–24 & Ex. 1 (Second Charles Deposition).)  Dale Ford interviewed and subsequently hired Charles in October 2008 to be PFS's Accounting and Finance Manager.  (*Id.* at 58–60 & Ex. 2.) Charles' responsibilities included "the processing and auditing of payroll, accounts payable, auditing cash receipts, credit card reconciliation, and maintaining all inventory and fixed asset records."  (R. 82-1 (Barnum Affidavit).)  He also supervised **Erica Johnson**, who was directly responsible for payroll.  (R. 49-1 at 87–88 (Charles Deposition); R. 68-1 at 15–16 (Miller Deposition).)   Johnson was responsible for "cutting the physical check[s]" and making "deposit[s] into . . . bank account[s]" for per diem disbursements and for payroll.  (R. 70-1 at 45; *accord* R. 75-1 at 149 (Johnson Deposition).)  Charles supervised Johnson as it related to those functions.  (R. 70-1 at 45–46.)

In addition to Charles and Johnson, there are other actors relevant to the following narrative:  **Brett Heap** has been the Chief Executive Officer of Farheap Solutions, Inc., and General Manager of PFS for many years.  (R. 55-1 at 26 (Heap Deposition).)  **Rose Zollo** was a recruiter employed by PFS and was also Heap's "significant other" at the time.  (*Id.* at 74–75, 87.)  **Paul Barnum** functioned as Heap's Executive Assistant from October 11, 2010 until February 1, 2011, when he became the Chief Operating Officer of PFS.  (R. 54-1 at 5.)  **Robert "Dale" Miller** served as the Human Resources Manager for PFS during Charles' employment. (R. 68-1 at 12, 14.)  His responsibilities included recruitment, hiring, payroll, employee relations,

---

[2] Charles' application contained two significant misrepresentations.  Because the Court will not reach the merits of PFS's after-acquired evidence defense, however, the Court will simply mention them in passing.  First, while Charles represented in his application that he had never been convicted of a felony, (R. 70-1 at Ex. 1), he had, in fact, pleaded guilty in February 1999 to one count of conspiracy to commit fraud by interstate commercial carrier and to use interstate facilities to carry on commercial bribery, (R. 74-6).  Second, Charles represented in his application that he was a Certified Public Accountant.  (R. 70-1 at Ex. 1.)  What Charles omitted to say was that his license had been inactive since 1994.  (*Id.* at 10–11, 59.)

Form I-9 verification, personnel record retention, and progressive discipline.[3]  (*Id.*)  Last but not least, **Marwan Khalifa** became the Corporate Controller of Farheap Solutions on January 31, 2011.  (R. 72-1 at 14–15 (Khalifa Deposition).)  In that role, Khalifa oversaw the accounting department at PFS.  (*Id.* at 18.)  Khalifa considered himself to be Charles' supervisor.  (*Id.* at 118.)

### 1.

The smaller portion of the present controversy dates back to a meeting between Charles, Miller, Heap and Matthew Stack, who was an agent with PFS's health insurance provider, Anchorage Insurance.  (R. 49-1 at 186–87.)  Charles could not recall exactly when the meeting occurred, but thought it happened sometime in 2010.  (*Id.*)  During the meeting, in Charles' words, Heap told Stack "that he was going to fire everybody over 50 in the plant to lower his health premium rates."[4]  (*Id.*)  According to Charles, Heap's statement is "the only reason" he thought PFS discriminated against him on the basis of his age.  (*Id.* at 187.)

### 2.

The larger portion of this dispute begins sometime around November 2009, when United States Immigration and Customs Enforcement issued a Notice of Inspection to PFS indicating that it would audit PFS's immigration-related documents.  (*See* R. 77-15.)  As a result of its investigation, ICE monitored PFS's hiring practices; issued PFS a Warning Notice dated March 18, 2011; and scheduled a follow-up inspection for August 19, 2011.  (*See* R. 77-22.)  Consequently, Charles became concerned about PFS's employment practices generally and about PFS's relationship with two individuals more particularly.

---

[3] PFS terminated Miller in December 2011, and Miller filed his own lawsuit against PFS regarding his termination.  (R. 68-1 at 5, 12.)  PFS and Miller settled that dispute sometime prior to November 2014.  (*Id.* at 6.)

[4] Miller expressly denies any recollection of Heap's statement, (*id.* at 134), and neither party asked Heap about the alleged incident during his deposition.

**a.**

PFS employed **José "Cheech" Guzman** from 2006 until terminating his employment in December 2009 in connection with the ICE inspection.  (*See* R. 74-8 ¶ 1 (Guzman Affidavit).) Guzman subsequently returned to Mexico where he formed a company, Allmxprint.  (*Id.* ¶¶ 2–3, 5.)  In February 2011, PFS retained Allmxprint to assist in "run building," *i.e.*, using computer software to efficiently arrange the printing process.  (*Id.* ¶¶ 4–7; *see also* R. 49-1 at 98–99; R. 54-1 at 85.)  PFS treated Allmxprint as an independent contractor, and Guzman used Skype and other instant messaging services to communicate with PFS employees in Kentucky.  (R. 74-8 ¶¶ 6–7.)  PFS paid Allmxprint through a PayPal account established in Guzman's name.  (R. 54-1 at 84–85.)

Sometime in early February 2011, Charles expressed concern to Barnum about PFS's decision to retain Guzman as an independent contractor.  (*See* R. 49-1 at 95–96.)  Charles suspected that Guzman was not authorized to work in the United States because PFS had previously terminated him during the ICE inspection.  (*Id.* at 95–96, 99–100.)  Charles worried that Guzman was working in the United States after William "Bill" Morrison, the Production Manager at PFS, told Charles that Guzman might be living with Javier Ortiz, who was a Run Builder at PFS.  (*See id.* at 98; R. 54-1 at 8, 132.)  Charles asked Barnum where Guzman resided, and Barnum replied that he wasn't sure, but thought Guzman was in Mexico.  (R. 49-1 at 100.) Subsequently, in an e-mail exchange dated February 16, Charles told Johnson that Guzman resided in Mexico and that she need not prepare a Form 1099 for him.[5]  (R. 49-2 at Ex. 8; *see also* R. 75-1 at 93–94.)

---

[5] It does appear that PFS issued Guzman a Form 1099 listing an address in Louisville, Kentucky.  (*See* R. 77-24.)  However, according to Johnson, she did not complete that Form 1099.  (R. 75-1 at 119.)  Johnson further testified that, in her experience, the Form 1099 would have been completed in January 2012—well after Charles' termination.  (*Id.* at 119, 122.)

4

But regardless of whether Guzman's resides in Mexico or in the United States, Charles never refused to make any payment to him. On February 18, 2011, Charles told Heap and Khalifa via e-mail that he sent $1,000 to Guzman, and that he would "continue to send [Guzman] $500 weekly until told otherwise." (R. 49-1 at Ex. 9.) When asked at his deposition if he ever declined to make payments to Guzman, Charles responded: "I personally didn't make them, but they were made." (*Id.* at 100.) Counsel pressed: "Did you ever refuse or decline to have these payments made to Mr. Guzman?" (*Id.*) Charles responded: "No." (*Id.*)

### b.

PFS hired **José Salazar** as a Bindery Manager in March 2011. (R. 54-1 at 88–89; R. 68-1 at 37.) Salazar was to be an independent contractor until April 2011, at which time PFS would transition him to a regular payroll employee. (R. 55-1 at 127–128; R. 68-1 at 56–57.) To that end, Salazar completed an application for employment, a Form W-4, a Form I-9, and other new hire documents on March 8. (R. 68-1 at Exs. 16–19; *see also id.* at 113–18.) Salazar also presented what appeared to be a valid California driver's license and social security card as supporting documentation. (*Id.* at 116; *see also* R. 74-10.) However, in August 2011, PFS terminated Salazar's employment when he "failed to produce written proof" of his authorization to work in the United States. (R. 55-1 at 130–31.)

Charles harbored two concerns about PFS's decision to employ Salazar. (R. 49-1 at 119.) First, Charles disagreed that Salazar qualified as an independent contractor. (*Id.*) Second, Charles thought that Salazar was not legally authorized to work in the United States. (*Id.*) According to Charles, he came to the second conclusion based on a conversation he had with Miller. (*See id.* at 119–20.) The record is not clear on many details regarding that conversation: For example, according to Charles, his conversation with Miller occurred sometime in March.

(*Id.* at 119–20, 137–38.)   But Miller testified in somewhat greater detail that his conversation with Charles took place on April 15, 2011.  (R. 68-1 at 104; *see also id.* at 104–09.)

Regardless of when the conversation occurred, as Charles recounts, Miller discussed with him an earlier conversation between Salazar, Miller, and Heap, during which Salazar told Miller and Heap that he had no right to work in the United States.[6]  (R. 49-1 at 119–20.)   Charles testified that he brought his concerns about Salazar to Heap's attention sometime in March 2011. (*Id.* at 131–32.)  As Charles explained during his deposition:  "I wanted [Heap] to know that [Johnson] and I were very concerned that Salazar was here illegally and he did not qualify as a 1099 employee."  (*Id.* at 132.)  Heap responded, in Charles' words:  "Do what you're told or we'll get rid of you."[7]  (*Id.* at 133; *see also id.* at 133–35.)

There is no evidence that Charles refused to make any payment to Salazar.  Instead, throughout March and April, the record shows that PFS issued paychecks to Salazar on March 24, April 5, and April 22, 2011.  (R. 77-25.)  Moreover, on April 26, 2011, Barnum e-mailed Charles and asked him to issue Salazar a check for $2,158.67 as a "performance bonus" in addition to "income paid to him during the month of March as a consultant to PFS."  (R. 77-29.) Charles forwarded the request to Johnson later that afternoon, (*id.*), and PFS issued Salazar a check in the amount Barnum requested the following day, (R. 77-25).

### 3.

Third in the series of events giving rise to Charles' lawsuit was the manner in which PFS calculated per diem payments for Heap, Barnum, and Zollo.  (R. 49-1 at 165–66; R. 54-1 at 63.) In 2011, PFS began using the per diem method of expense reimbursement.  (R. 49-1 at 165–66;

---

[6] Miller's testimony is somewhat different.  Miller recalls having a conversation with Salazar, but he insists that Heap was not present.  (R. 68-1 at 104–09.)

[7] Heap denies having any conversation with Charles regarding Salazar's authorization to work in the United States.  (R. 55-1 at 69–71.)

R. 54-1 at 63.)  Around that time, Heap stopped by Charles' office and said that he wanted to put Zollo on a per diem.  (R. 49-1 at 157.)  According to Charles, Heap stated that Zollo "want[ed] a raise and this is the only way I can give her one without costing me any money."  (*Id.*)  Charles told Heap that he thought the per diem payments to Zollo were illegal because, as far as Charles knew, Zollo had no travel expenses.  (*Id.* at 164–65.)  Heap didn't respond, and nothing else was said during the conversation.  (*Id.* at 165.)

It is undisputed that, prior to Charles' termination, the per diem reimbursement calculations for Heap, Barnum, and Zollo failed to comply with Internal Revenue Service guidelines.  (*See* R. 74-1 at 10.)  Near the end of February, Khalifa discovered the per diems were not being properly calculated:  He noticed "that the rate didn't change from one pay period to the next."  (R. 72-1 at 83; *see id.* at 82–83.)  According to Khalifa, he instructed Charles and Johnson to reconcile the per diems "based on the number of days that the individual was traveling, and the rate for that location where they were traveling to."  (*Id.* at 83.)  However, PFS continued to improperly calculate the per diems even after Charles' termination.  (*See* R. 73 at Ex. 8.)

Around March, Charles discussed the per diem issue with Barnum and, perhaps, Heap.  (R. 49-1 at 170–72.)  Based on his knowledge of past company practices, Charles told Barnum that Barnum and Heap's per diems were incorrect because, as far as Charles knew, neither Barnum nor Heap had any out-of-pocket expenses to reimburse.  (*Id.* at 171.)  Barnum told Charles that he disagreed with him, (*id.* at 172), but nothing else came from this conversation.

When asked at his deposition if he told either Barnum or Heap that he refused to disburse the per diems, Charles said:  "I did not make the payments."  (*Id.* at 174.)  Counsel asked again:  "Did you tell them you refused to have the payments made?"  (*Id.*)  Charles responded:  "I don't

7

recall." (*Id.*)  But Charles said that he and Johnson did discuss the issue, that Johnson made the payments, and that he never told her not to.  (*Id.* at 174–75.)

### 4.

The fourth and final piece of the puzzle is Charles' job performance.  Shortly after Khalifa started in February 2011 as Farheap Solutions' Corporate Controller, he became concerned about the operation of PFS's accounting department, which Charles managed.  (R. 72-1 at 43.)  Khalifa recounted a number of those performance-related issues during his deposition.

For example, Khalifa observed that the accounting department failed to post cash transactions and invoices in a timely manner.  (*Id.* at 43, 65.)  According to Khalifa, cash transactions and invoices were to be posted no later than Tuesday of each week so that Farheap Solutions could determine what balances to pay and ensure that the checking accounts had sufficient funds to cover the payments.  (*Id.* at 43–44.)  When PFS's accounting department failed to meet that deadline, Khalifa would be forced to make additional cash transfers.  (*See id.* at 154.)

Khalifa also discovered that Charles was depositing checks for PFS without informing Farheap Solutions.  (*Id.* at 153–54.)  Charles' nondisclosure left Khalifa with the feeling "that he may have been hiding that money for nefarious purposes," (*id.* at 154), although Khalifa conceded that there was no evidence of Charles ever misappropriating funds from PFS, (*id.* at 159).  But the delay affected the way that Farheap Solutions transferred funds because it did not create an "accurate picture of where the cash was for the company."  (*Id.* at 154.)

In addition, PFS's accounting department failed to timely process payroll.  (*Id.* at 65, 90–92.)  Khalifa testified that payroll was to be processed no later than the Tuesday immediately prior to the end of the pay period.  (*Id.* at 90–91.)  If processed on time, Farheap Solutions would

be able to transfer the funds necessary to cover payroll without paying wire transfer fees—even if those fees were meager sums. (*Id.* at 90–92.)  When not timely processed, Farheap Solutions was not able to accurately project cash flow for the coming week. (*Id.* at 65.)

Khalifa also instructed PFS's accounting department to close each month within five to seven business days after the end of the month, (*id.* at 29), a task which Charles failed to complete for February and March 2011, (*id.* at 30–32).  It is true that on April 8, 2011, Khalifa sent an e-mail to Charles—and to the entire accounting staff of both Farheap Solutions and PFS—praising the lot for "an excellent effort closing the financial statements."  (R. 73 at Ex. 13.)  But Khalifa made mention of how it proved "more difficult than usual because [the accounting departments] also had to close January and February 2011."[8]  (*Id.*)

### 5.

Over the course of three months, Khalifa spoke with and verbally reprimanded Charles about these issues, (*see, e.g.*, R. 72-1 at 74–75, 92–93), although Charles denies being reprimanded as to at least one allegation, (R. 49-1 at 80).  It is also uncontested that Khalifa never made any record memorializing the disciplinary actions.  In isolation, Khalifa testified, any one of these incidents would not justify discharge, (*see, e.g.*, R. 72-1 at 74–75, 92–93), but he said no such thing in the aggregate.

Between March and April 2011, Khalifa approached Heap about terminating Charles on three separate occasions.  (*Id.* at 105–08; R. 55-1 at 118–19.)  Sometime in early April, Khalifa made the decision to terminate Charles, (R. 72-1 at 108–09), and Heap "acquiesced" in Khalifa's determination, (R. 55-1 at 119).  Barnum communicated the decision to Charles, but was unable

---

[8] True enough, Khalifa had additional issues with Charles' performance.  The record also makes mention of other, isolated incidents between Charles and members of Farheap Solutions' financial team.  In the interest of brevity, the Court recites these as illustrative examples.

to tell him why he had been terminated.  (R. 54-1 at 28; R. 49-1 at 91.)  Charles' termination

became effective on May 4, 2011.  (R. 49-1 at 91; R. 54-1 at 28.)

PFS hired 31 year-old Christina Greenwell to replace Charles.  (R. 74-3 ¶ 6 (Burwinkel

Affidavit).)  Following Greenwell's resignation in March 2012, Brent Coomes assumed her

responsibilities at the age of 37 until April 2012.  (*Id.* ¶ 7.)  Thereafter, each person to hold

Charles' position has been older than Charles at the time of his termination.  (*Id.* ¶ 8.)

**B.**

Charles filed an action against PFS in state court on August 25, 2011, alleging wrongful

termination and age discrimination—both under Kentucky law.  (R. 1-2 ¶¶ 12–22 (Complaint).)

PFS removed the action under 28 U.S.C. § 1441.  (R. 1 at 1.)  The Court has subject-matter

jurisdiction based on the parties' diverse citizenship.  On January 9, 2015, PFS moved for

summary judgment on both counts.  (R. 74 at 1.)  The Court will discuss the legal standards

involved and, then, will turn to address the merits.

**II.**

Summary judgment is appropriate when the record, viewed in the light most favorable to

the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of

material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The

Court "may not make credibility determinations nor weigh the evidence when determining

whether an issue of fact remains for trial."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th

Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*,

188 F.3d 365, 369 (6th Cir. 1999)).  "The ultimate question is 'whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, PFS must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Charles' claims. Fed. R. Civ. P. 56(c); *see Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Assuming PFS satisfies its burden of production, Charles "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).  Keeping this standard in mind, the Court moves on to the merits.

## III.

### Wrongful Termination

Charles' first count is for wrongful termination.  Ordinarily, Kentucky allows "an employer [to] discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983) (citing *Prod. Oil Co. v. Johnson*, 313 S.W.2d 411 (Ky. 1958); *Scroghan v. Kraftco Corp.*, 551 S.W.2d 811 (Ky. Ct. App. 1977)).  But to that general rule, Kentucky recognizes a limited exception for terminations against public policy. *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985); *accord Hall v. Consol of Ky. Inc.*, 162 F. App'x 587, 589–90 (6th Cir. 2006).

The exception is narrow:  The employee's discharge must be "contrary to a fundamental and well-defined public policy as . . . evidenced by a constitutional or statutory provision." *Grzyb*, 700 S.W.2d at 401.  Absent an express legislative prohibition, there are "only two

11

situations . . . where 'grounds for discharging an employee are so contrary to public policy as to be actionable.'" *Id.* at 402 (quoting *Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982)).   Those situations are (1) "where the alleged reason for the discharge of the employee was the [employee's] failure or refusal to violate a law in the course of employment," and (2) "when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Id.* (quoting *Suchodolski*, 316 N.W.2d at 711–12).   The question of whether there is an actionable public-policy foundation is a matter of law for the Court to determine. *Id.* at 401.   "Kentucky courts applying *Grzyb* have limited their analysis to whether the discharge was for one of these two enumerated reasons." *Hall*, 162 F. App'x at 589 (citing *Nork v. Fetter Printing Co.*, 738 S.W.2d 824, 827 (Ky. Ct. App. 1987); *Moss v. Robertson*, 712 S.W.2d 351, 353 (Ky. Ct. App. 1986)).

Charles does not allege his discharge was explicitly prohibited by statute.   (R. 77 at 37 (Response to Summary Judgment Motion).)   Therefore, Charles must show that PFS discharged him because he either refused to violate the law in the course of his employment, or because he exercised a right conferred by well-established legislative enactment.   Charles relies on both theories.   (*See id.*)

## A.

## 1.

Charles contends that PFS discharged him because he refused to violate state law during the course of his employment.   (*Id.* at 38–42, 44–47.)   That claim rests on his alleged refusal "to participate in and to continue to violate" Kentucky's tax and withholding laws and various criminal statutes related to theft, forgery, fraud, and criminal conspiracy.   (*See* R. 9 ¶ 13; *see*

*also* R. 77 at 37.)  PFS violated those statutes, Charles argues, when it paid per diems to Zollo, Barnum, and Heap, and when it paid wages to Salazar and Guzman.[9]  (R. 77 at 38.)

To sustain a cause of action under the refusal exception, Charles must show that PFS made an affirmative request that he violate the law.  *See, e.g.*, *Welsh v. Phx. Transp. Servs., LLC*, No. 2007-CA-001231-MR, 2009 Ky. App. LEXIS 137, at *12 (Aug. 14, 2009) (unpublished); *accord Burnett v. Pinelake Reg'l Hosp., LLC*, No. 5:09-CV-00024, 2010 WL 231741, at *2 (W.D. Ky. Jan. 14, 2010).  He must also demonstrate that he refused to follow PFS's request or instruction.  *See Lorson v. Wal-Mart Stores, Inc.*, No. Civ.A. 5:05-CV-50-R, 2005 WL 1287421, at *2 (W.D. Ky. May 31, 2005) ("The exception applies where an employee is terminated because he *refused* to violate the law as directed by his employer.").  Even assuming, *arguendo*, that PFS requested Charles to disburse per diems or pay wages and that in doing so Charles would violate some Kentucky statute, the record is devoid of any evidence indicating Charles ever refused to carry out PFS's instructions.

There is no record evidence that Charles refused to make any payment to Guzman.  First, Charles told Heap and Khalifa via e-mail that he would "continue to send [Guzman] $500 weekly until told otherwise."  (R. 49-2 at Ex. 9.)  Second, when asked at his deposition if he ever declined to pay Guzman, Charles responded:  "I personally didn't make [the payments], but [the payments] were made."  (R. 49-1 at 100.)  Counsel immediately inquired if Charles "ever refuse[d] or decline[d] to have these payments made to Mr. Guzman," to which Charles replied

---

[9] Other than rote citation to a dozen sections of the Kentucky Revised Statutes, Charles makes no effort to analyze how PFS's conduct violated any statute that his Amended Complaint or Response cites; Charles does not list the statutory elements or discuss the *actus reus* and *mens rea* required to show an illegal act took place.  Therefore, the Court's discussion will remain proportionately general.  *Cf. Ott v. Quicken Loans, Inc.*, No. 2:13-CV-441-WHA, 2015 WL 248938, at *5 (M.D. Ala. Jan. 20, 2015) ("The Plaintiffs' Response to the Motion for Summary Judgment does not discuss their fraudulent suppression claim in any detail.  It does not list the elements of fraudulent suppression or discuss how they have been satisfied in this case.  Therefore, the court deems the fraudulent suppression claim abandoned and finds summary judgment is due . . . on the claim." (citing *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995))).

negatively.  (*Id.*)  In short, there is no evidence that he ever refused to pay, or discontinued paying, Guzman.

Likewise, the record is devoid of any evidence that Charles refused to make payments to Salazar.  Instead, the record shows that PFS issued paychecks to Salazar on March 24, April 5, and April 22, 2011.  (*See* R. 77-25.)  Then, on April 26, Charles forwarded a request from Barnum to Johnson requesting that she issue Salazar a "performance bonus" check.  (*See* R. 77-29.)  Johnson issued the check the following day.  (*See* R. 77-25.)  Charles never instructed Johnson to cease or withhold any payment.

Nor is there any record evidence to suggest that Charles refused to make per diem payments to Heap, Barnum, or Zollo.  When asked about them, Charles responded: "I did not make the payments."  (R. 49-1 at 174.)  And when asked again, Charles replied that he could not recall if he ever refused to make the payments.  (*Id.*)  He and Johnson discussed the issue, Charles said, and it was Johnson who made the payments.  (*Id.* at 174–75.)  But despite being her direct supervisor, Charles never told Johnson to cease and desist making payments.  (*Id.*)

Consequently, Charles cannot maintain a wrongful termination claim under the refusal exception.  *Childers v. Product Action International, Inc.*, 146 F. App'x 6 (6th Cir. 2005), is instructive on that point.  In *Childers*, an employee worked for a company that provided inspection services to various automotive manufacturers.  *Id.* at 7.  The employee sued the company for wrongful termination, alleging that it terminated him because he questioned its practice of not recording defective parts or notifying the manufacturers.  *Id.*  On appeal, the Sixth Circuit Court of Appeals affirmed summary judgment in favor of the company.  No reasonable jury could find that the company discharged the employee for "refusing to violate the law" when the employee had, in fact, falsified the records just "as he was instructed to do."  *Id.* at 9.  "His

own testimony, therefore, prevent[ed] him from claiming that he was retaliated against for refusing to violate the law or for exercising a right." *Id.*

Charles occupies no higher ground than the employee in *Childers*.  Charles certainly "expressed his personal opinion that PFS's methods of issuing per diem reimbursements, as well as its . . . payment[] of wages to certain workers, violated the law." (R. 74-1 at 21.)  But that is not what Kentucky law requires to support a wrongful discharge claim.  Instead, Charles must show he *refused* to undertake the allegedly illegal acts PFS supposedly asked of him.  Such refusal is a requisite element of a wrongful termination claim.  *Burgess v. Paducah Area Transit Auth.*, No. 5:03-CV-166-R, 2006 WL 2228956, at *8 (W.D. Ky. Aug. 2, 2006), *aff'd*, 387 F. App'x 538 (6th Cir. 2010).  Because Charles has not raised any genuine dispute as to that element, summary judgment for PFS is appropriate.

## 2.

Charles also bases his wrongful discharge claim on the allegation that he refused to violate provisions of the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359 (codified as amended in scattered sections of 8 U.S.C.).  Yet there is no need to explore the merits Charles' theory because Kentucky does not recognize wrongful discharge claims premised on federal law.  *See Shrout v. The TFE Grp.*, 161 S.W.3d 351, 355 (Ky. Ct. App. 2005) (citing *Alderman v. Bradley*, 957 S.W.2d 264 (Ky. Ct. App. 2005)); *accord Fleming v. Flaherty & Collins, Inc.*, 529 F. App'x 654, 659 (6th Cir. 2013); *Peak v. Tru-Check, Inc.*, No. 13-11-GFVT, 2014 WL 235442, at *3 (E.D. Ky. Jan. 22, 2014); *Cole v. Mgmt. & Training Corp.*, No. 4:11-CV-118-JHM, 2013 WL 5924431, at *12 (W.D. Ky. Oct. 31, 2013), *vacated in part on reconsideration*, No. 4:11-CV-118-JHM, 2014 WL 2612561 (W.D. Ky. June 11, 2014); *Clark v. Sanofi-Synthelabo, Inc.*, 489 F. Supp. 2d 759, 771 (W.D. Ky. 2007); *Goins v. Interstate*

*Blood Bank, Inc.*, No. Civ.A. 403CV040M, 2005 WL 1653611, at *4 (W.D. Ky. July 12, 2005);

*Burgess v. Paducah Transit Auth.*, No. 5:03-CV-166-R, 2005 WL 1221821, at *9 (W.D. Ky.

May 23, 2005), *amended in part sub nom. Burgess v. Paducah Area Transit Auth.*, 2006 WL

2228956.  As said by the Fourth Circuit Court of Appeals:

> It would be an astonishing step for a federal court to impose in the first instance
> the entire Code of Federal Regulations on every Maryland employer.  There are
> thousands and thousands of pages in the fifty titles of the C.F.R.  If a federal court
> were to announce that these were all sources of Maryland public policy, an
> employee could immunize himself against adverse employment action simply by
> reporting an alleged violation of any regulation.  And the narrow wrongful
> discharge exception, carefully carved out by the Maryland courts, would then
> supplant the general at-will employment rule.  Such a ruling would turn
> federalism on its head.

*Szaller v. Am. Nat'l Red Cross*, 293 F.3d 148, 152 (4th Cir. 2002), *cited with approval in Goins*,

2005 WL 1653611, at *4.  That rationale applies with equal force in the Commonwealth.

Charles disagrees, and points the Court to *Bell v. Ashland Petroleum Co.*, 812 F. Supp.

639 (S.D. W. Va. 1993), in which the district court held that an employee who refused to violate

federal law properly pleaded a cause of action under Kentucky's public policy exception.  *Id.* at

641.  But at best *Bell* is dated—or, at worst, outright antiquated.  The District Court for the

Southern District of West Virginia admitted at the time that it was crossing uncharted waters:

"Neither party," *Bell* said, was able to direct "the Court's attention to cases addressing [federal

law's] interaction with [Kentucky's] public-policy exception."  *Id.*  And so *Bell* looked to other

jurisdictions in an effort to predict how the Kentucky Supreme Court would decide the issue.

*See id.* (collecting cases from Colorado, Illinois, and Missouri).  But since that time, no

Kentucky court has cited to—much less endorsed—*Bell*.  Therefore, the Court rejects *Bell* as a

correct statement of prevailing Kentucky law.  Charles cannot state a wrongful discharge claim

premised on federal law, and PFS is entitled to summary judgment under such a theory.

**B.**

Charles also suggests that his "objections and reports of illegal activity [were] the exercise of rights conferred by a well-established legislative enactment." (R. 77 at 38). To plead a wrongful termination claim under the protected-activity exception, Charles must first identify a public policy clearly articulated in the Kentucky Revised Statutes. *See Shrout*, 161 S.W.3d at 354 (citing *Grzyb*, 700 S.W.2d at 400). Next, he must show an employment-related nexus—that the policy embodied in the law is "directed at providing statutory protection to the worker in his employment situation." *Id.* (citing *Grzyb*, 700 S.W.2d at 400); *see also McDaniel v. ISP Chem., Inc.*, No. 2007-CA-001492-MR, 2008 WL 5428264, at *3 (Ky. Ct. App. Dec. 31, 2008) (holding the Kentucky Environmental Protection Act and Kentucky Water Quality Act "do not address the employment setting and do not provide a well-established right upon which McDaniel could base a wrongful discharge claim"). Finally, Charles must establish that "the protected activity was 'a substantial and motivating factor but for which the employee would not have been discharged.'" *Follett v. Gateway Reg'l Health Sys., Inc.*, 229 S.W.3d 925, 929 (Ky. Ct. App. 2007) (quoting *First Prop. Mgmt. Corp. v. Zarebidaki*, 867 S.W.2d 185, 188 (Ky. 1993)). "While it is possible for a criminal statute to provide recourse for adverse employment decisions based on violations of a statute, such a recourse must be explicit to form a cause of action for wrongful termination." *Smith v. Norton Healthcare, Inc.*, No. 2014-CA-000352-MR, 2015 WL 5307705, at *2 (Ky. Ct. App. Sept. 11, 2015) (citing *Mitchell v. Univ. of Ky.*, 366 S.W.3d 895, 902–03 (Ky. 2012)).

In support of his claim, Charles directs the Court to *Workforce Development Cabinet v. Gaines*, 276 S.W.3d 789 (Ky. 2008). According to Charles, *Gaines* stands for the proposition

that Kentucky law protects an employee who makes an internal report of wrongdoing from retaliatory discharge. (R. 77 at 38.) Charles is only half right.

*Gaines* involved a disclosure by a public employee under the Kentucky Whistleblower Act (codified at Ky. Rev. Stat. Ann. §§ 61.101 to .103). 276 S.W.3d at 791–92. The case presented the question of whether the Act protected a public employee from retaliation when she made an internal disclosure of what she suspected to be a violation of Kentucky law. *Id.* at 791. The Kentucky Supreme Court held that it did. *Id.* at 794. It said: "The Act has a remedial purpose in protecting *public employees* who disclose wrongdoing. It serves to discourage *wrongdoing in government*, and to protect those who make it public." *Id.* at 793 (emphasis added). The Kentucky Supreme Court announced nothing novel in *Gaines*. Indeed, in its words, the case presented "purely a matter of statutory interpretation." *Id.* at 792.

Charles would read *Gaines* as announcing that the Kentucky Whistleblower Act provides protection to employees of every stripe. But the Act cannot bear the weight that Charles would place on it. As it is written, the Act expressly limits its protections to employees of public entities. *See* Ky. Rev. Stat. Ann. §§ 61.101 to .102. Here, it is undisputed that Charles and PFS are private entities, so Charles has no rights to exercise under the Kentucky Whistleblower Act. *See Burke v. Shelby Energy Coop., Inc.*, No. 2011-CA-000657-MR, 2012 WL 1649107, at *3 n.2 (Ky. Ct. App. May 11, 2012) ("Burke cannot claim protection under the Whistleblower Act, KRS 61.102, because she was a private, rather than a public, employee.").

A better example is *Zumot v. Data Management Co.*, No. 2002-CA-002454-MR, 2004 WL 405888 (Ky. Ct. App. Mar. 5, 2004), on which Charles also relies. In *Zumot*, an employee discovered a fraudulent payroll scheme and disclosed his findings to the fraudster's business partners. *Id.* at *1. The employee was terminated in due course, and he filed suit against the

employer for wrongful discharge.  *Id.*   The trial court granted summary judgment to the employer, and the Kentucky Court of Appeals affirmed.  It held that the employee's report of "illegal activity to those other than public authorities [was] not protected activity under the public policy exception."  *Id.*  The Court of Appeals' rationale is sound:

> [T]here is no statute requiring a citizen to report such activity and by reporting it only to the individuals within [the] business circle, [the employee] neither furthered nor affected a public interest. . . . [B]y notifying only those in the private business relationship, [the employee] cannot claim that his discharge was motivated by an attempt to contravene a statutory or constitutional provision.

*Id.* at *2.

*Zumot* resolves this claim.  During his employment, Charles made no disclosure to any public authority about what he characterizes as PFS's unlawful activities.  (*See* R. 49-1 at 126–27, 175.)  There is no evidence that Charles exercised any right embodied in a well-established legislative enactment, that an employment-related nexus is present, or that his supposedly protected activity substantially contributed to his termination.  Therefore, PFS is entitled to summary judgment as a matter of law on Charles' protected-activity exception claim too.

## IV.

## Age Discrimination

Charles also brings a statutory claim under the Kentucky Civil Rights Act (KCRA) alleging that PFS terminated him because of his age.  *See* Ky. Rev. Stat. Ann. § 344.040(1)(a).[10] Charles may establish a violation of the KCRA by either direct or circumstantial evidence.  *See Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009).  "Direct evidence is 'that evidence

---

[10] Kentucky courts have long analyzed claims of age discrimination under the KCRA in the "same manner" as those under the federal Age Discrimination in Employment Act (ADEA).  *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008) (citing *Williams v. Tyco Elec. Corp.*, 161 F. App'x 526, 531 & n.3 (6th Cir. 2006); *Harker v. Fed. Land Bank of Louisville*, 679 S.W.2d 226, 229 (Ky. 1984)); *see also Riley v. PNC Bank, Nat'l Ass'n*, 602 F. App'x 316, 319 n.4 (6th Cir. 2015).  Therefore, the Court will rely on decisions from federal courts within the Sixth Circuit to guide its analysis.

which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action.'" *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 465 (6th Cir. 2014) (quoting *Geiger*, 579 F.3d at 620). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 330 (6th Cir. 2012) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)) (internal quotation marks omitted). Whether by direct or indirect evidence, Charles "must prove 'age was the "but-for" cause of the challenged employer decision.'" *Scola*, 557 F. App'x at 465 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). Charles contends that he may defeat summary judgment through either path.

## A.

Charles offers the following as direct evidence of age discrimination: During a meeting between Heap, Charles, Miller, and an insurance agent with Anchorage Insurance, Heap told the insurance agent "that he was going to fire everybody over 50 in the plant to lower his health premium rates." (R. 49-1 at 186.) Charles could not recall when the meeting occurred, but thought it happened sometime in 2010. (*Id.*) According to Charles, Heap's statement is "the only reason" he thought PFS discriminated against him on the basis of his age. (*Id.* at 187.)

Taking all reasonable inferences in the light most favorable to Charles, the Court must assume that Heap made this comment sometime in 2010. *See Skelton v. Sara Lee Corp.*, 249 F. App'x 450, 454–55 (6th Cir. 2007); *Dekarske v. Fed. Express Corp.*, 294 F.R.D. 68, 81 (E.D. Mich. 2013). However, that does not end the inquiry. In the Sixth Circuit, statements allegedly showing an employer's age bias are to be evaluated considering four factors:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the

decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Skelton*, 249 F. App'x at 455 (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477–78 (6th Cir. 2002)); *see also EEOC v. Memphis, Light, Gas & Water Div.*, — F. Supp. 3d ——, ——, 2015 WL 4606091, at *7 (W.D. Tenn. July 31, 2015); *Gibbs v. Voith Indus. Servs., Inc.*, 60 F. Supp. 3d 780, 792 (E.D. Mich. 2014); *DeBarr v. Cleveland Clinic Found.*, 918 F. Supp. 2d 676, 682–83 (N.D. Ohio 2013); *Hillman v. Safeco Ins. Co. of Am.*, 190 F. Supp. 2d 1029, 1035 (N.D. Ohio 2002), *aff'd*, 62 F. App'x 628 (6th Cir. 2003).  "None of these factors is individually dispositive of age discrimination, but rather, they must be evaluated as a whole, taking all of the circumstances into account."  *Peters*, 285 F.3d at 478 (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994)).  An assessment of these factors cautions against treating Heap's uncorroborated and stray comment as direct evidence of age discrimination.

It goes without saying that, as the General Manager of PFS, Heap qualifies as a decision-maker for that entity.  Yet the record indicates Heap had little involvement in Charles' termination.  Under prevailing Circuit law, that is the more relevant point of focus.  In his deposition, Heap said that he played no role in terminating Charles.  (R. 55-1 at 119.)  Instead, Khalifa made the ultimate decision to terminate Charles' employment.  (R. 72-1 at 106–08.)  Heap merely acquiesced in that decision.  (R. 55-1 at 119.)  "Therefore, although [Heap], as a general matter, may have been a 'decision-maker' in his position as [General Manager]," Charles has presented little "evidence to suggest that [Heap] was a decision-maker with regard to the decision to terminate" his employment.  *Skelton*, 249 F. App'x at 455.

Likewise, there is little "evidence that [Heap's] statement . . . in any way *related* to [Khalifa's] decision-making process in terminating [Charles]."  *Id.*  It is not enough for the statement itself to be discriminatory.  Rather, the "direct evidence of discriminatory remarks

must also relate those remarks to the decision to terminate" the particular employee.  *Dekarske*, 294 F.R.D. at 82 (citing *Geiger*, 579 F.3d at 621; *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)); *cf. Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) ("Age-related comments *referring directly to the worker* may support an inference of age discrimination." (emphasis added) (citing *McDonald v. Union Camp*, 898 F.2d 1155, 1162 (6th Cir. 1990))).  The Sixth Circuit Court of Appeals has "repeatedly held that isolated ambiguous comments out of context do not constitute direct evidence of age discrimination."  *Loper v. Comput. Network Tech. Corp.*, 128 F. Supp. 2d 1061, 1065 (E.D. Mich. 2001) (collecting cases).  Although a close call, even in the light most favorable to Charles, Heap's statement is just "too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination."  *Phelps*, 986 F.2d at 1025 (quoting *Gagne v. Nw. Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989), *abrogation on other grounds recognized by Wright v. Murray Guard, Inc.*, 455 F.3d 702 (6th Cir. 2006)) (internal quotation marks omitted).  "It is therefore reasonable to conclude that [Heap's] statement was an isolated and irrelevant remark that had no influence on the termination decision."  *Skelton*, 249 F. App'x at 455–56 (citing *Phelps*, 986 F.2d at 1025).

Moreover, Charles is unable to offer much in way of temporal proximity.  The closest Charles gets to pinpointing when Heap made the alleged statement is sometime late in 2010, and his testimony is uncertain—not unequivocal—as to that date.  (*See* R. 49-1 at 186.)  Even assuming the truth of Charles' testimony, the proximity between Heap's comment and Charles' termination is too remote to constitute direct evidence of discrimination.  The Sixth Circuit Court of Appeals has instructed:

> the District Court indicated that Gibson made [a discriminatory] comment sometime in 2002.  The decision to terminate Skelton was made on or about October 18, 2002.  Thus, although the comment and the decision to eliminate Skelton's position occurred in the same calendar year, it is unclear whether

Gibson's comment was made 'proximate in time' to Defendant's decision to terminate Skelton.

*Skelton*, 249 F. App'x at 456 (citing *Asmo v. Keane, Inc.*, 471 F.3d 588, 600 (6th Cir. 2006) (Griffin, J., dissenting)); *see also Phelps*, 986 F.2d at 1026 ("Because McCulloch made the statements nearly a year before the layoff, the comments were made too long before the layoff to have influenced the termination decision."). Decisions of other courts within this Circuit broadly agree. *See, e.g.*, *Hillman*, 190 F. Supp. 2d at 1035 (holding comments made in the "beginning half of 2000" and resignation "in September 2001" too remote); *cf. Memphis, Light, Gas & Water*, — F. Supp. 3d at ——, 2015 WL 4606091, at *7 (holding comments made during decision-making process "proximate in time to the adverse action").

In sum, because none of the four factors weigh in Charles' favor, his age discrimination claim fails under a direct evidence analysis.

**B.**

But Charles presses his age discrimination count on an indirect evidence theory too. When, as here, there is no direct evidence of discriminatory motive, Charles may prove discriminatory treatment using circumstantial evidence under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973). Under this framework, Charles must first establish a prima facie case of discrimination. *Riley*, 602 F. App'x at 319 (citing *McDonnell Douglas*, 411 U.S. at 802). "Then the burden of production shifts to [PFS] to proffer a legitimate non-discriminatory reason for the adverse action." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). If PFS is able to make that showing, "the burden shifts back to [Charles] to show the proffered reason was pretext for discrimination." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804; *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

**1.**

Charles has established a prima facie case of age discrimination:  (1) He is over 40 years of age; (2) he suffered an adverse action, *i.e.*, discharge; (3) he has adduced evidence of his qualification for the position; and (4) he was replaced by a "substantially younger" employee. *Id.* at 320; *see also Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004).  PFS concedes that Charles satisfies the first two of the four prongs.  (R. 74-1 at 34.) While it contests the third and fourth, its arguments are of no moment.

**a.**

To argue that Charles was not qualified for his job, PFS points to the string of issues Khalifa and others had with Charles' job performance starting at least in February 2011.  (*See id.* at 34–37.)  But as Charles points out, the Sixth Circuit Court of Appeals has rejected this type of argument on more than one occasion.

> [A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case.  To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

*Hale*, 503 F. App'x at 333 (alteration in original) (quoting *Wexler*, 317 F.3d at 574) (internal quotation marks omitted).  Charles satisfies this prong of his prima facie case.

**b.**

PFS also contends that Charles fails to meet the fourth prong because he has not shown that he was replaced by someone outside of the protected class—that is, under the age of 40. This argument flounders.[11]  "[T]he fact that an [age discrimination] plaintiff was replaced by

---

[11] In a recent decision, the Sixth Circuit Court of Appeals rejected an argument nearly identical to that PFS advances.  The Sixth Circuit declined to adopt a district court's decision that, "in the context of multiple hires for the same position, plaintiffs cannot establish a prima facie case of age discrimination when the employer hires at least

someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996).  "While some of this Circuit's cases, in reciting the elements of a prima facie case, have stated that an [age discrimination] plaintiff must show that he was replaced by someone outside of the protected class, it is sufficient to show that a replacement is substantially younger."  *Hale*, 503 F. App'x at 333–34 (citation omitted).  That Charles has done, and so he has satisfied the fourth prong of his prima facie case.

### 2.

In its briefing, PFS states that it terminated Charles because of "numerous and repeated performance deficiencies." (R. 74-1 at 35.)  Charles does not appear to contest that PFS's reason is a legitimate, nondiscriminatory one on which to base his discharge.  (*See* R. 77 at 33–36.)  Nor could he, as issues with performance "are facially legitimate reasons" to terminate an employee.  *Hale*, 503 F. App'x at 334.   PFS has carried its burden to articulate a legitimate, nondiscriminatory reason to terminate Charles.

### 3.

With this showing made, the burden shifts back to Charles "to produce enough evidence to allow a reasonable jury to infer that [PFS's] proffered reasons are pretextual and that he was actually fired because of his age."  *Id.*   Charles may demonstrate pretext "by showing by a preponderance of the evidence '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [PFS's] action, or (3) that [the proffered reasons] were insufficient to motivate [PFS's] action."  *Riley*, 602 F. App'x at 320 (second alteration in original) (quoting *Chen*, 580 F.3d at 400).  If Charles creates "only a weak issue of fact as to

---

one person older or not substantially younger than each plaintiff for the positions for which they applied." *Johnson v. Lockheed Martin Corp.*, 598 F. App'x 364, 368 n.1 (6th Cir. 2015).

whether [PFS's] reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination . . . occurred, [PFS] is entitled to summary judgment." *Johnson*, 598 F. App'x at 369 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)) (internal quotation marks omitted); *see also Chen*, 580 F.3d at 400 n.4.

Charles makes two arguments as to pretext.  First, Charles argues albeit in a truncated fashion, that even if not direct evidence, Heap's statement is at least indirect evidence in support of his age discrimination claim.  (R. 77 at 36.)  Second, he says, PFS's proffered reasons had no basis in fact. (*Id.* at 35–36.)  Neither argument raises a genuine issue of material fact.[12]

### a.

It is true enough that although Heap's age-related comment is not direct evidence of age discrimination, it may be indirect evidence that PFS's employment decision was impermissibly based on Charles' age.  *See Hale*, 503 F. App'x at 335; *Memphis, Light, Gas & Water*, — F. Supp. 3d at —, 2015 WL 4606091, at *8.  But the "mere existence of a scintilla of evidence in support of [Charles'] position" will not defeat a motion for summary judgment.  *March v. E. Associated Estates Realty*, 521 F. App'x 460, 468 (6th Cir. 2013) (quoting *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 576 (6th Cir. 2008)) (internal quotation marks omitted).  Taken in the light most favorable to Charles, Heap's isolated and stray comment is not sufficient evidence on which a reasonable jury could find PFS's proffered reason to be pretextual.  *See Rowan*, 360 F.3d at 550.

The mere fact that purportedly age discriminatory comments were made by Heap "at some point in time is not necessarily evidence of age bias in the decision-making process."

---

[12] Even if Charles advanced with sufficient particularity arguments as to the remaining two types of showings, the Court concludes that, viewing the record in the light most favorable to him, he cannot show any genuine dispute of material fact regarding the true reason for his termination.

*Scuderi v. Monumental Life Ins. Co.*, 344 F. Supp. 2d 584, 601 (E.D. Mich. 2004).  And even if something more than a stray remark, Heap's comment "was not tied directly to [Charles'] termination," and so is "at best weak circumstantial evidence of discriminatory animus." *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993).  Heap was neither a direct decision-maker with respect to Charles' termination, nor was his comment made in relation or proximity to the decision to terminate Charles.  *See Scola*, 557 F. App'x at 467; *Geiger*, 579 F.3d at 624.  Heap testified that he did not make the decision to terminate Charles.  (R. 55-1 at 119.)  While Heap ultimately "acquiesced to the decision to fire him," (*id.*), the record shows that Khalifa—after consulting with other Farheap Solutions' employees—made the decision to discharge Charles, (R. 72-1 at 106–08).  And Khalifa testified that he did not consider Charles' age to be a factor.  (*Id.* at 151).  He neither knew Charles' age, nor the age of any person that he interviewed for Charles' position.  (*Id.* at 151–52.)  Charles has introduced little evidence to the contrary.  "In light of these facts, [Heap's] isolated and ambiguous remark regarding [PFS's insurance premiums] is insufficient to demonstrate that [PFS's] nondiscriminatory reason for discharging [Charles] is pretextual."  *Wheelwright v. Clairol, Inc.*, 770 F. Supp. 396, 401 (S.D. Ohio 1991).[13]

### b.

Charles also advances the idea that PFS's issues with his job performance are without basis in fact.  (R. 77 at 33–36.)  For example, Charles makes much of the fact that PFS has not produced "a single written discipline" regarding his performance.  (*Id.* at 35.)  The absence of a

---

[13] In passing, PFS makes mention that some courts factor into the analysis an employee's age at the time of hire—*i.e.*, whether the employee was over the age of 40.  (R. 74-1 at 34 n.9.)  It points out that PFS hired Charles at the age of 54 and terminated him at the age of 57.  "It seems rather suspect," the Seventh Circuit Court of Appeals has said, "to claim that the company that hired [an employee] at the age of 47 'had suddenly developed an aversion to older people' two years later."  *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1147 (7th Cir. 1994) (quoting *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 174–75 (8th Cir. 1992)); *accord Wheelwright*, 770 F. Supp. at 401 ("Furthermore, Essington hired the [employee] when the [employee] was age 64 and made the [employee] a regular part-time merchandiser at age 65.").  While certainly not without some merit, the Court need not consider if, in light of subsequent developments, *Rand* and *Wheelwright* reflect prevailing law in this Circuit.

written performance plan is uncontested.  (R. 82 at 21 (Reply).)  But that is of no consequence. *Cf. Skelton*, 249 F. App'x at 462 ("[E]ven if we assume that Defendant's evaluation process was haphazard—at least as it pertained to note-taking during the interviewing process—there exists no reasonable inference that Defendant discrimination on the basis of age." (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1285 (9th Cir. 2000); *Peters*, 285 F.3d at 470)).  The record is clear that Charles received a number of verbal reprimands, and that PFS—Khalifa, in particular—considered his performance to be deficient.  A lack of written disciplinary action is not evidence sufficient to give rise to an "inference of discrimination in the eyes of a reasonable factfinder."  *Scola*, 557 F. App'x at 467.

Charles may disagree about the adequacy of his job performance, but that does not create a genuine dispute of material fact.  *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725–26 (6th Cir. 2012) ("Though Lefevers disputes aspects of the contents and context of the performance appraisals, his disagreement with GAF's 'assessment of his performance . . . does not render [GAF's] reasons pretextual.'" (alteration in original) (quoting *McDonald*, 898 F.3d at 1162)).  He "does not raise a genuine issue of material fact as to the quality of his work merely by challenging the judgment of his supervisors."  *Wheelwright*, 770 F. Supp. at 400 (citing *McDonald*, 898 F.2d at 1160); *accord Johnson*, 598 F. App'x at 369 ("Absent additional evidence, plaintiffs' beliefs about their own qualifications 'cannot sustain a claim of discrimination.'" (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004))).

In summary, even with the benefit of the doubt, the record as a whole reveals no genuine issue of material fact on which a jury could reasonably conclude that PFS discharged Charles because of his age.  In the absence of such a dispute, PFS is entitled to judgment on Charles' age discrimination count as a matter of law.

**V.**

For the aforementioned reasons, Defendant's Motion for Summary Judgment (ECF No. 74) is **GRANTED**.  An appropriate order will issue separate from this Memorandum Opinion.

Date:

cc:     Counsel of Record